ARCHER v. ELLISON.

SAME v. SMITH.

1. A deed conveying land to "A. and the natural heirs of her body," creates a fee conditional.

2. The fact that A then had children living does not bring this grant under the second rule in Wild's case, there being nothing in the context requiring "heirs of the body" to be construed as meaning issue or children.

3. A fee conditional is an estate of inheritance, and therefore a married woman might relinquish her inheritance therein, under the act of 1795.

4. A release of inheritance by a married woman in 1863, before a magistrate of a district in which neither the married woman resided nor the land lay, was not before a proper officer under the law, and was therefore invalid.

5. The punctuation of a statute cannot be permitted to control the construction that is required by other and more weighty considerations.

6. The question of the statute of limitations not considered for want of a statement in the "Case" of the facts bearing upon that question.

Before ALDRICH, J., Pickens, June, 1887.

The opinion fully states the case.

*Mr. James P. Carey*, for appellant.

*Messrs. Perry & Heyward*, contra.

March 14, 1888. The opinion of the court was delivered by

MR. JUSTICE McIVER. These two cases being actions to recover possession of two tracts of land, one in the possession of J. M. Ellison, defendant in the first case above stated, and the other in possession of Glenn M. Smith, defendant in the second case. were heard and will be considered together.

The plaintiffs claim title as heirs of their mother, Eliza Archer, and the defendants claim under a purchase from her. The two tracts in controversy were originally embraced in one tract, which was conveyed to "said Eliza Archer and the natural heirs of her body," by her father, Thomas Blassengame, by a deed bearing date August 24, 1852. On December 10, 1859, the said Eliza Archer joined with her husband, Washington E. Archer, in a deed whereby the said land was conveyed to William Ellison.

On that deed there is endorsed a renunciation of inheritance by Mrs. Archer, regular in form, taken by one R. L. Gentry, who was then a magistrate for the District (now County) of Edgefield, South Carolina. Mrs. Archer was then, and continued up to the time of her death to be, a resident of the State of Georgia, and the land in question lies in the County of Pickens. This renunciation of inheritance bears date March 4, 1863, and was recorded July 29, 1884, the day before these actions were commenced, though it is stated in the decree of the Circuit Judge that "this relinquishment was not recorded until after the commencement of these actions." The dates, however, above given are those found in the "Case." On February 28, 1870, Washington E. Archer died, and on December 23, 1878, his widow, Eliza, departed this life, leaving as her heirs at law the plaintiffs and the defendant, A. E. Dill, who are the heirs of her body and were in existence at the time of the execution of the deed from Thomas Blassengame above referred to. The plaintiff, John H. Archer, is a resident of this State, but the other two heirs have been residents of another State since the year 1856.

William Ellison continued in possession of the land in dispute from the time of the execution of the deed to him, above mentioned, until his death in the year 1864. In 1869, his heirs conveyed the land to J. M. Ellison and J. H. Ellison, and on

July 10, 1875, J. H. Ellison conveyed his interest to J. M.
Ellison.   On January 25, 1876, J. M. Ellison conveyed 37½
acres of the land to Glenn M. Smith, one of the defendants in
the action second above stated, who is now in possession of the
same, leaving J. M. Ellison in possession of the remainder.   The
defendants claim title under the deed from Washington E. Archer
and wife Eliza, and the release of her inheritance in 1863, and
also set up the statute of limitations.

By consent a trial by jury was waived and both cases were
tried by the court.   The Circuit Judge held that the relinquish-
ment of inheritance was good and valid, notwithstanding the fact
that it was not taken by an officer of the county where the mar-
ried woman resided, nor by an officer of the county in which the
land lies, and, therefore, without considering any other question
in the case he rendered judgment dismissing the complaints in
both actions.   From this judgment the plaintiffs appeal, sub-
stantially upon two grounds:   I. Because the interest of Mrs.
Archer in the lands not being a fee simple, a magistrate had no
power to take a renunciation of her inheritance.   II. Because a
magistrate of Edgefield District, in which neither the married
woman resided nor the land lay, had no power to take the
renunciation of inheritance.

The first inquiry, therefore, is as to the nature of the estate
which Mrs. Archer took under the deed from Blassengame.   The
language of that conveyance is "to the said Eliza Archer and the
natural heirs of her body," and this seems to be such language as
would be appropriate to create an estate in fee conditional.   The
appellants contend that by the words used in this deed the
grantor intended to convey the land to Eliza Archer and such of
her children as were then in existence. the conveyance opening
so as to embrace any other children who might afterwards come
into existence, and that as the plaintiffs and the defendant, A. E.
Dill, were in existence at the time of the execution of the deed,
they took with her equal shares as tenants in common, and,
therefore, Mrs. Archer could convey no more than her undivided
interest in the land.   We do not see how this view can be
sustained, and the cases cited by the appellant certainly do not
support such a construction.

But if the appellants mean to contend, as the cases cited would seem to indicate, that Mrs. Archer took under the deed only a life estate with remainder to her children, we are equally unable to see how such a view can be sustained. The first case cited is *Hays* v. *Hays* (5 *Rich.*, 31), where the language of the devise was: "I lend unto my beloved daughter, Marina Hays, 594 acres of land  *  *  * and, at her death, I then lend the premises unto her children, each to be equally benefited thereby : and at their death I then give said premises to their issue, to be equally divided among them, but in case there be no such issue, then I give it to my next of kin," and it was held that Marina Hays only took an estate for her life, upon the authority of *McLure* v. *Young*, 3 *Rich. Eq.*, 559. In that case the language of the devise was to C., "for and during the term of her natural life, and at her death I give, bequeath, and devise the same absolutely and forever to her lineal descendants ; and in case she should die without lineal descendants (one or more) living at the time of her death, then" over : and it was held that C. took a life estate with remainder to her issue as purchasers.

In neither of these cases was there any direct gift to the children, or issue or lineal descendants, but the manifest import of the words used was that the children were to take *after* their parent, and we are unable to discover any analogy in the cases cited to the one under consideration. The case of *Nix* v. *Ray* (5 *Rich.*, 423) has also been cited. In that case a father, by deed, gave personal property to his three daughters "and the future heirs of their body," to be equally divided between them, with a limitation over to the survivors if either of the daughters should die without any lawful heirs of her body, and it was held that each of the daughters took a life estate, with remainder to the heirs of her body, living at the time of her death, as purchasers. In all of these cases it will be seen that the language used is so wholly different from that found in the deed under consideration, as to make it difficult to understand how they can affect the present case.

It may be that the contention on the part of the appellants is that, under the second resolution in *Wild's Case*, as recognized in *Reeder* v. *Spearman* (6 *Rich. Eq.*, 92), that both Eliza

Archer and her children took estates for life.  But here the con-
veyance is not to Mrs. Archer and her *children* or *issue*, but to
her and the natural *heirs* of her body, and to bring this case
under that resolution it would be necessary to construe the word
"heirs" as meaning children or issue.  Now, though this may be
done in a case where the context demands it, as for example in a
case like that of *Hayne* v. *Irvine* (25 *S. C.*, 289), yet we are
unable to discover anything in the terms of this deed which calls
for or warrants such a construction of the terms "heirs of the
body," and they must therefore receive their primary and natural
signification; and giving those words that construction, it is
manifest that the estate conveyed to Eliza Archer by the deed of
Thomas Blassengame was a fee conditional, which after the birth
of issue she could alienate, provided she complied with the terms
of the statute authorizing a married woman to do so.

Next it is contended that the act of 1795 (5 *Stat.*, 257), which
was the law in force at the date of the relinquishment of inherit-
ance here brought in question, only contemplated estates held in
fee simple, and hence only authorized a married woman to convey
an estate of that character; and in support of this position the
case of *Hays* v. *Hays* (5 *Rich.*, 31) is cited.  But in that case
the married woman only held a life estate, and that not being an
estate of inheritance was not contemplated by the act of 1795.
Here, however, the estate of Mrs. Archer, as we have seen, was
a fee conditional, which is an estate of inheritance, and, there-
fore, comes within the express terms of the act.  As was said by
Judge O'Neall in the case just cited, quoting the language of the
act, "any real estate as her inheritance," this "means, not such
an estate as she may have inherited, but such an estate as is
capable of descent and inheritance from her."  The additional
language used by Judge O'Neall, "The words in conveying
away the fee simple of the same, clearly show the character of
the estate which, by the law, she was then permitted to convey,"
were not designed to limit the operation of the act to estates held
in fee simple, for it had been previously held by the Court of
Errors in the case of *Kottman* v. *Ayer* (1 *Strob.*, 552), that the
word "inheritance" as used in the act of 1795 was not confined
to an estate which had descended to the wife, but included every

estate which, upon her death, by operation of law would descend to her heirs. As was said in *Burnett* v. *Burnett* (17 *S. C.*, 551), there is, in this respect, but little difference between an estate in fee simple and an estate in fee conditional. Both descend to the heirs, the former to the heirs generally, the latter to a particular class of heirs, the heirs of the body. It seems to us, therefore, that it was competent for a married woman to release her inheritance in an estate held by her in fee conditional.

Our next inquiry is whether Mrs. Archer has renounced her inheritance in the manner prescribed by the act of 1795. As has been held in numerous cases, at the time the conveyance here brought in question was executed, "a married woman could not convey her estate of inheritance unless she followed with scrupulous exactness the provisions of the statute conferring that power upon her." *Wingo* v. *Parker*, 19 *S. C.*, at page 13, and the cases there cited, as well as the subsequent case of *Williams* v. *Cudd*, 26 *Id.*, 213. It is necessary to examine the terms of the statute with a view to ascertain whether its terms have been strictly complied with in this instance. But as the only objection urged against the certificate in this case is that it was not given by the proper officer, we may confine our examination of the statute to those portions of it which prescribe what officers may take the renunciation.

The third section of the act of 1795 (5 *Stat.*, 257) provides that the married woman may relinquish her inheritance : "Provided she will go before some one of the judges or justices, in the second clause of this act mentioned," after the expiration of the prescribed time and make the required declaration. We must, therefore, turn to the second clause, or section, of the act for the purpose of ascertaining what officers are there mentioned, and upon doing so we find that the officers there mentioned, are "any judge of the Court of Common Pleas, or justice of the quorum, or any judge of the court of the county wherein she she may reside, or the land may be." Now, as it is conceded that the officer who took this relinquishment of inheritance was not an officer of the county in which Mrs. Archer resided, nor of the county in which the land lies, the precise question for us to determine is whether he can be regarded as one of the officers

mentioned in the act; for unless he can be so regarded it is quite manifest that the terms of the act have not been complied with, and the renunciation of inheritance can therefore have no force and effect.

It is quite certain that a "judge of the court of the county" cannot take such renunciation unless he is a judge either of the county where the woman resides or of the county where the land lies, and the exact question for us to decide is whether such qualification applies also to the officer just previously named, "justice of the quorum," for whom an officer styled "magistrate" was subsequently substituted. It certainly would seem that there was the same, if not a better, reason for applying this qualification to the justice of the quorum, as there was for applying it to a judge of the county court; for the latter being an officer of higher rank and greater dignity than the former, it can scarcely be supposed that the legislature intended to confine the authority of the *superior* officer within narrower limits than those prescribed for the *inferior* officer. But when in addition to this it is remembered that the jurisdiction and authority of a justice of the quorum was confined to the county for which he was appointed, and when we find that the legislature in abolishing the office of justice of the quorum by the act of 1839, and substituting in lieu thereof an officer designated as magistrate, whose jurisdiction and authority was expressly limited by the act to the district for which he was appointed, there would seem to be no doubt that the intention of the legislature was to confer the authority to take a renunciation of a married woman's inheritance only upon a justice of the quorum or magistrate, as the case might be, according as the act was done before or after the act of 1839, appointed for the county or district in which the woman resided, or for the county or district in which the land lies. Otherwise the jurisdiction of these officers would be extended beyond the limits to which they were confined; and that, too, without any express words in the statute, or any words necessarily implying that their jurisdiction should be so extended.

It is argued, however, that the punctuation found in the act of 1795 shows that the limitation clearly imposed upon the "judge of the court of the county" does not apply to the justice of the

quorum, because there is a comma ofter the word "quorum," which serves to separate it from what follows. But this argument loses all of its force when we find that it has been held as settled law by the highest authority, that "punctuation is no part of a statute," and "should not have a controlling influence." *Hammock* v. *Loan & Trust Company*, 105 *U. S.*, at page 84. In that case the question was whether a judge at chambers, under the revised statutes of Illinois, could hear a motion for the appointment of a receiver. The language of the statute was: "The several judges of said courts shall have power in vacation to hear and determine motions, to dissolve injunctions, stay or quash executions," &c., and there, as here, the argument rested on the punctuation, the comma after the word motions, but the court disregarded the comma and held that the power claimed, to appoint a receiver, could not be derived from the language of the statute, but that the power must be confined notwithstanding the comma to the matters subsequently specified.

In that case Mr. Justice Harlan, after using the language which we have quoted above, cites, amongst other authorities, the case of *Doe* v. *Martin* (4 *T. R.*, at page 65), where Ld. Kenyon, C. J., said: "We know that no stops are ever inserted in acts of parliament, or in deeds; but the courts of law in construing them must read them with such stops as will give effect to the whole." In that case the question was whether all the children took estates for life or in fee, under a certain provision in a marriage settlement in these words: "And for want of such appointment, then to the use of all and every the child or children equally, share and share alike, to hold the same, if more than one, as tenants in common, and not as joint tenants, and if but one child, then to such only child, his or her heirs and assigns forever." Here again the argument rested on the effect of the comma; for if that punctuation mark had the effect of separating the words "his or her heirs and assigns forever," from the words used in the first part of the sentence, then the estate given to all the children, not being accompanied with any words of inheritance, would only be a life estate. But Ld. Kenyon said: "The question is, whether the words 'his or her heirs' may not with propriety, and ought not, considering the whole settlement and the

manifest intention of the parties, to act as words of limitation on all the preceding words in the sentence : I cannot bring myself to doubt but that they may," and then added the words above quoted as to punctuation in an act of parliament.

So here we say that considering the whole scope of the act, and the authority of the several officers therein mentioned, and considering that the construction contended for by respondents, based, as it is, solely upon the punctuation, would impute to the legislature the anomaly of limiting the authority of a superior officer within narrower bounds than those prescribed for an inferior officer, and especially considering that such construction would render it necessary to extend, by implication merely, the jurisdiction of a magistrate beyond the limits expressly prescribed by the act creating the office, we can come to no other conclusion than that the limitation in regard to residence and location of the land, which undoubtedly is imposed upon the judge of the county court, extends also to the justice of the quorum, or in this case the magistrate who had been substituted for that officer, at the date of the renunciation here in question. It seems to us, therefore, that the renunciation of inheritance in this case was taken by an officer who had no power or authority to do so and that it is void and of no effect. He had no jurisdiction over the county in which the woman resided, and none over the county in which the land lies. This view was, impliedly at least, recognized in *Campbell* v. *Moon* (16 *S. C.*, 107), though the question here made was not expressly raised in that case.

The question presented by the defendants' plea of the statute of limitations was not considered or determined in the Circuit Court, as under the view taken by the Circuit Judge it was not necessary to do so, and therefore the point is not properly before us for review. It is true that this court may sustain a judgment below upon other grounds than those upon which it was placed by the Circuit Court ; and it is in this view, we presume, that the question of the statute of limitations was argued here. The respondents, however, do not seem to have given the notice, indicated as the proper practice in such cases in *Weinges* v. *Cash* (15 *S. C.*, 57), but as the question was argued by appellants' counsel, and he cannot, therefore, plead a want of notice

that such a question would be raised in this case, we would not decline to consider the question simply because the practice indi‑ cated in the case last cited was not followed. But we do not think that sufficient facts appear in the "Case" to enable us to determine the questions arising out of the defendants' plea of the statute of limitations. It does not appear with sufficient distinct‑ ness what were the precise times at which the *possession* of the several persons named commenced and ended, nor what was the character of such possession, which, of course, is always import‑ ant in questions of this kind. Nor does it appear in the "Case" whether J. M. Ellison and J. H. Ellison were heirs at law of William Ellison, or, if so, whether they remained in possession continuously after his death. In view of these and other difficul‑ ties which might be suggested, we do not propose to decide any‑ thing in reference to the statute of limitations, but will leave that matter entirely open.

The judgment of this court is, that the judgment of the Circuit Court be reversed, and that the case be remanded to that Court for a new trial.